[Cite as *State v. S.A.A.*, 2020-Ohio-4650.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 17AP-685 |
| v. | : | (C.P.C. No. 13CR-1858) |
| [S.A.A.], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 29, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Frederick D. Benton, Jr.*, for appellant. **Argued:** *Frederick D. Benton, Jr.*

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, S.A.A., appeals an August 28, 2017 judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdicts of guilty, and imposing sentences for 11 counts of rape and 4 counts of gross sexual imposition against two child sisters. For the reasons explained below, we affirm.

**I. Facts and Procedural History**

{¶ 2} On April 4, 2013, a Franklin County Grand Jury indicted appellant for 5 counts of gross sexual imposition and 11 counts of rape of three young sisters, P.T., T.A., and K.T., in years 2010, 2011, 2012, and 2013. Appellant pled not guilty. A trial was held on 15 of the 16 originally indicted counts and the jury found appellant guilty of all tried counts. The 16th count, the only count involving the youngest of the three girls, K.T., was not tried to completion and was dismissed by the state during trial.

{¶ 3}    On April 14, 2016, this court reversed the convictions finding appellant was denied due process and a fair trial and his right to effective assistance of counsel.  This court found, however, that sufficient evidence supported the jury's verdicts and therefore reversed and remanded the case to the trial court for a new trial.  *State v.* [*S.A.A.*], 10th Dist. No. 15AP-852, 2016-Ohio-1553.

{¶ 4}    On July 17, 2017, the trial began for a second time on remand.  At trial, seven witnesses testified, including the detective who investigated the case, two social workers who interviewed the children at the Child Advocacy Center ("CAC"), a nurse who examined the children, the children's mother, and the two sisters, P.T. and T.A., who were teenagers at the time of the second trial.

{¶ 5}    The jury found appellant guilty on all 15 counts.  The trial court sentenced appellant on August 23, 2017.  The trial court denied appellant's request to merge the offenses and ultimately imposed life without parole plus 25 years to life.  Specifically, the trial court imposed 5 years to be served concurrently on each of the 4 gross sexual imposition counts, 25 years to life on each of the 6 rape counts related to P.T., and life without parole for each of the 5 rape counts related to T.A., with one of the rape counts for P.T. to be served consecutively to one of the rape counts for T.A.

{¶ 6}    Appellant timely appealed.

## II. Assignments of Error

{¶ 7}    Appellant presents seven assignments of error for our review as follows:

I. THE DENIAL OF [S.A.A.'S] SEVERAL MOTIONS FOR MISTRIAL WAS AN ABUSE OF DISCRETION BY THE TRIAL COURT.

II. THE PROSECUTOR'S MISCONDUCT DENIED [S.A.A.] A FAIR TRIAL AND DUE PROCESS OF LAW, IN VIOLATION OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION, ARTICLE 1, §§10 AND 16, OF THE OHIO CONSTITUTION, AND O.R.C. §2901.05.

III. THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY REGARDING SPOLIATION OF EVIDENCE.

IV. [S.A.A.'S] RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE TRIAL COURT ALLOWED THE STATE TO PRESENT IRRELEVANT, CUMULATIVE, OVERLY PREJUDICIAL

EVIDENCE ABOUT ALLEGATIONS OF A SEXUAL ASSAULT FOR WHICH THE ACCUSED WAS NOT ON TRIAL.

V. [S.A.A.'S] CONVICTION WAS LEGALLY INSUFFICIENT AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

VI. [S.A.A.'S] RIGHT TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED THROUGH CUMULATIVE ERROR.

VII. THE TRIAL COURT ERRED IN FAILING TO MERGE COUNTS 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, AND 15.

## III. Discussion

### A. Assignment of Error IV:

**The Trial Court Did Not Err in Not Reviewing in Advance and in Admitting the Video Interviews of the Two Prosecuting Child Witnesses, and to the Extent There Was Any Error, Such Error Was Harmless**

{¶ 8} We begin by addressing the fourth assignment of error. For reasons explained in detail below, we conclude the trial court did not err in not reviewing in advance and in admitting the video interviews of the two prosecuting child witnesses. Furthermore, to the extent there was any error, such error was harmless.

{¶ 9} Appellant argues the trial court abused its discretion because it did not review the video interviews before allowing portions of the interviews to be played for the jury. Specifically, at trial and in his appellate brief, appellant repeatedly objected to: (1) plaintiff-appellee, State of Ohio's, characterization of the video interviews as a medical record, (2) the cumulative nature of playing the video interviews when the prosecuting witnesses and the interviewers were also testifying in court, and (3) the portions of the video interviews in which the prosecuting witnesses spoke about acts involving K.T., which was the basis of a count previously dismissed. We address each of these objections below.

#### 1. Trial Court's Failure to Review the Video Interviews Before Playing for the Jury

{¶ 10} Regarding whether the trial court abused its discretion because it did not review the video interviews before allowing portions of the interviews to be played for the jury, we note, first, that appellant did not argue that failure to review the video interviews in advance constituted error. Furthermore, at trial, although appellant made repeated objections to playing the video interviews to the jury, it was the state, not appellant, that

requested on several occasions that the trial court review the entire video before ruling on the objections, in particular for purposes of determining whether the statements made by the prosecuting witnesses constituted impermissible other acts. Finally, even if there was error, no prejudice resulted.

{¶ 11} " 'A trial court has broad discretion over the admission or exclusion of evidence, and a reviewing court generally will not reverse an evidentiary ruling absent an abuse of discretion that materially prejudices the affected party.' " *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 41, quoting *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 16. Furthermore, "[e]rror in the admission or exclusion of evidence is grounds for reversal only where substantial rights of the complaining party were affected or substantial justice appears not to have been done." *Jarvis v. Hasan*, 10th Dist. No. 14AP-578, 2015-Ohio-1779, ¶ 70, citing *Faieta v. World Harvest Church*, 10th Dist. No. 08AP-527, 2008-Ohio-6959, ¶ 73; Civ.R. 61 ("[n]o error in * * * any ruling or order or in anything done * * * by the court * * * is ground for * * * disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice"); Evid.R. 103(A) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). "To show an evidentiary ruling has affected a substantial right, the party must demonstrate that the alleged error impacted the final determination of the case." *Id.*, citing *Lips v. Univ. of Cincinnati College of Medicine*, 10th Dist. No. 12AP-374, 2013-Ohio-1205, ¶ 49, citing *Campbell v. Johnson*, 87 Ohio App.3d 543, 551 (2d Dist.1993).

{¶ 12} In this case, abuse of discretion, if any, in failing to review the video interviews before showing them to the jury did not affect appellant's substantial rights, was not prejudicial, and was ultimately harmless because the two prosecuting child witnesses themselves testified and were subject to cross-examination, as were the interviewers.

{¶ 13} Furthermore, abuse of discretion, if any, in characterizing the video interviews as medical statements, permitting cumulative evidence and permitting other acts evidence, did not result in unfair prejudice to appellant.

### 2. Characterization and Admission of the Video Interviews as Medical Statements[1]

---

[1] Evid.R. 803 states: "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: * * * (4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

{¶ 14} Regarding the trial court's characterization and admission into evidence of the video interviews as medical statements, we look to the Supreme Court of Ohio's decision in *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742. In *Arnold*, the Supreme Court held:

> 1. Statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination.

> 2. Statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause.

*Id.* at paragraphs one and two of the syllabus.

{¶ 15} Appellant argues his Sixth Amendment right to confrontation was violated when the trial court admitted the video interviews because the interviews had a forensic or investigative purpose. Appellant argues specifically that the interviews were forensic because they were not conducted for a medical purpose but, rather, by a trained social worker not qualified to render a medical diagnosis, were not conducted in response to a medical emergency or need, and were taken in an effort to avoid multiple interviews by police, Children Services, and others.

{¶ 16} This court considered similar arguments in *Hughes*, where Hughes appealed the trial court's admission of a social worker's testimony regarding what a prosecuting witness had stated during an interview conducted by the social worker. In *Hughes*, we observed Hughes' reliance on *Arnold* was misplaced for two reasons. We noted first, Hughes' argument ignored the second paragraph of the syllabus in *Arnold*. Second, we noted that "paragraph one of the syllabus in *Arnold* is explicit that the statements violate the Confrontation Clause[2] *only when the declarant is unavailable for cross-examination*." (Emphasis sic.; emphasis added.) *Hughes* at ¶ 43, citing *Arnold*. Because the prosecuting

---

[2] The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." This means "admission of an out-of-court statement of a witness *who does not appear at trial* is prohibited * * * if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness." (Emphasis added.) *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 657 (2011).

witness testified in *Hughes*, we concluded there was no concern regarding the Confrontation Clause. *Id.* In *Hughes*, we relied on *State v. Boyer*, 10th Dist. No. 06AP-05, 2006-Ohio-6992. In *Boyer*, we stated:

> *Crawford* [*v. Washington*, 541 U.S. 36 (2004)] states that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."

*Id.* at ¶ 18, quoting *Crawford v. Washington*, 541 U.S. 36, 59 (2004), fn. 9, citing *California v. Green*, 399 U.S. 149, 162 (1970). In *Boyer*, we noted that Confrontation Clause and *Crawford* questions were not applicable to the admission of an intake summary which included statements made by the victim and the victim's mother because the victim and the victim's mother both testified at trial. *Id.* at ¶ 18.

{¶ 17} Here, as in *Hughes* and *Boyer*, the prosecuting witnesses testified and were subject to cross-examination. CAC interviewers also testified and were cross-examined. Consistent with *Hughes* and *Boyer*, we conclude here the trial court did not violate appellant's right to confrontation in admitting the video interviews into evidence.[3]

{¶ 18} In addition to concluding the trial court did not violate appellant's rights pursuant to the Confrontation Clause, we also conclude the trial court did not abuse its discretion in admitting the video interviews pursuant to the hearsay exception in Evid.R. 803(4). In his appellate merit brief, appellant outlined several specific questions which witnesses Diane Lampkins and Kerri Wilkinson asked of the prosecuting witnesses during the interview. Appellant argues these questions were for purposes of forensic investigation. Specifically, appellant argues: "The focus clearly was not of a medical nature, nor was the questions [sic] designed to develop a diagnosis." (Appellant's Brief at 45.)

{¶ 19} In determining whether statements fall into the Evid.R. 803(4) hearsay exception, the objective purpose for which a statement is collected is not the determinative inquiry. In *State v. D.W.*, 10th Dist. No. 18AP-690, 2019-Ohio-2193, ¶ 13, we rejected the argument that the focus of determining whether the interview statements were testimonial

---

[3] Appellant argues in his brief the fact that the prosecuting witnesses also testified is immaterial because the admissibility of the video interviews "must be independently established as to its reliability." (Appellant's Brief at 46.) It is not necessary for us to consider this argument as appellant did not raise the issue of reliability of the video interviews at trial. Furthermore, even if we were to consider the argument, appellant relies on *State v. Storch*, 66 Ohio St.3d 280 (1993), which he concedes involves the admissibility of a recorded interview when the declarant was unavailable. Also, appellant's argument regarding reliability is really an argument that the playing of the video interviews was cumulative. (*See* Appellant's Brief at 45-47.) Finally, contrary to appellant's argument, when the prosecuting witnesses testify the trier of fact is able to ascertain the credibility of the victim. *State v. Johnson*, 5th Dist. No. 2016CA00069, 2016-Ohio-8261, ¶ 53.

should be on the "overall testimony of the forensic interviewer and purpose of the interview and not on the statements of [the prosecuting witness]," and we refused to change the focus of the court's analysis in *Arnold* from that of the child's statements to the overall purpose of the forensic interview. Therefore, we refuse to do the same here and change the focus from the children's statements to the interviewers questions alone—with no indication of the statement provided in response.

{¶ 20} Furthermore, in *D.W.*, the defendant did not explain which of the prosecuting witnesses' specific statements he believed to be improperly admitted and we declined to undertake a statement-by-statement analysis to determine whether any particular statement by a prosecuting witness was improperly admitted. Here, it is significant to note that although appellant outlined specific questions he found objectionable in his appellate merit brief, he did not specifically outline the same questions before the trial court.[4] Rather, appellant argued generally at trial that the entire video interviews were for purposes of forensic investigation. In addition, appellant does not present any analysis or argument regarding the statements of the prosecuting witnesses in response to the specific questions he finds objectionable. We decline to conduct such analysis or conjure any argument regarding the statements on his behalf.

---

[4] The trial court expressed extreme frustration with appellant's attorney for failing to specifically identify the statements within the interviews he found to be objectionable:

> [Appellant's trial counsel]: I don't know how much further this can go, Your Honor.
>
> THE COURT: [Appellant's trial counsel], you are in charge. You were to direct me to certain statements that are at issue. I have never reviewed this. And for you to allow this to go on is not my issue.
>
> [Appellant's trial counsel]: Judge, I did not allow this. I did not play the video. I pointed out to the Court and made consistent objections that anything referencing [K.T.] should not be played, and it is being played anyway.
>
> THE COURT: You did not point out 14.53.
>
> [Appellant's trial counsel]: I did point these out, Your Honor.
>
> [Prosecuting attorney]: That is why I made a record of it before we began, Your Honor.
>
> THE COURT: Okay.

(July 21, 2017 Tr. Vol. IV at 659-60.)

{¶ 21} Finally, as to appellant's arguments that the trial court both violated his constitutional right to confrontation and abused its discretion in admitting the video interviews of the prosecuting witnesses as medical statements, we note that error, if any, was harmless. In *Arnold*, upon finding the trial court erred in admitting certain forensic statements made by the prosecuting witness to interviewers at CAC, the Supreme Court remanded the case to the court of appeals to consider whether the admission of the prosecuting witness's forensic statements was harmless. In doing so, the court cited *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791.[5]

{¶ 22} In *Conway*, the court stated that a constitutional error can be held harmless if we determine it was harmless beyond a reasonable doubt. *Id.* at ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24 (1967). Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *Id.*, citing *Chapman* at 23; *State v. Madrigal*, 87 Ohio St.3d 378, 388 (2000). The standard for non-constitutional error is whether the error affected the substantial rights of the appellant. Crim.R. 52(A).

{¶ 23} Taking into consideration here that the two prosecuting child witnesses, as well as the interviewers, were present to testify and subject to cross-examination, as well as the other evidence submitted at trial, we conclude that errors, if any, were harmless beyond a reasonable doubt and did not affect the substantial rights of appellant.

### 3. Cumulative Evidence

{¶ 24} Under Evid.R. 403(B),[6] a trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, ¶ 59. Cumulative evidence " 'is additional evidence of the same kind to the same point.' " *State v. Teitelbaum*, 10th Dist. No. 14AP-310, 2016-Ohio-3524, ¶ 89, quoting *Smith v. Chatwood*, 2d Dist. No. 2618 (Aug. 15, 1990), citing *Kroger v. Ryan*, 83 Ohio St. 299 (1911), paragraph one of the syllabus. " 'Evid.R. 403(B) does not require

---

[5] *But see* the Supreme Court's discussion of constitutional versus unconstitutional error in *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052. Nevertheless, we conclude under either standard, error here, if any, was harmless.

[6] Evid.R. 403 states: "(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. (B) Exclusion discretionary. Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

exclusion of cumulative evidence. The court has discretion to admit or exclude it.' " *Id.,* quoting *State v. Campbell*, 69 Ohio St.3d 38, 51 (1994). Unless a trial court has "clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court [regarding the admission of evidence]." *Obermiller* at ¶ 61.

{¶ 25} While appellant objected to the playing of the video interviews, he also objected to the live testimony of P.T. and T.A., which provided an opportunity for him to cross-examine the same prosecuting witnesses who the jury witnessed in the video interviews. We do not find the trial court abused its discretion in permitting the video interviews of the two prosecuting child witnesses in addition to their live testimony. Finally, we find any error in this regard was harmless.

### 4. Other-Acts Evidence[7]

{¶ 26} Regarding other-acts evidence in the form of P.T. and T.A.'s video interview statements or testimony regarding their sister K.T., or a criminal charge which was previously dismissed, appellant's counsel, the prosecutor, and the court made an effort to identify portions of the video interviews which made reference to K.T. and to redact the same. The court and the state agreed to redact any reference to the dismissed charge in the video interview of P.T. There also appeared to be agreement as to certain portions of T.A.'s video interview which would be redacted. Nevertheless, whether inadvertently or intentionally, portions of T.A.'s video interview which referenced K.T. were shown to the jury. Appellant objected at numerous points on grounds that such evidence was impermissible evidence of other acts and not admissible pursuant to Evid.R. 404(B).[8] Ultimately, the trial court determined that all video interviews were admissible as medical

---

[7] "To determine the admissibility of the other-acts evidence, a court must first 'consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.' " *State v. C.W.*, 10th Dist. No. 15AP-1024, 2018-Ohio-1479, ¶ 30, quoting *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20, citing Evid.R. 401. "Second, a court must 'consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).' " *Id.*, quoting *Williams*. "Finally, the court must 'consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.' " *Id.*, quoting *Williams*, citing Evid.R. 403. It is not necessary for us to conduct this analysis.

[8] Evid.R. 404(B) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."

statements and any reference to K.T. was harmless.  Appellant maintained his objection but asked the court to give an instruction to the jury.  The court agreed and instructed the jury as follows:

> Ladies and gentlemen, I am going to specifically instruct you that you are instructed to disregard and they are not evidence and must be treated as if you never heard any statements with respect to [K.T.].  Okay?

(July 21, 2017 Tr. Vol. IV at 670.)

{¶ 27}  In *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, and *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, the Supreme Court set forth a three-step analysis for a trial court to conduct in determining the admissibility of other-acts evidence:

> The court must consider (1) whether the other-acts evidence is relevant under Evid.R. 401, i.e., whether it tends to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence, (2) whether the evidence is presented to prove a person's character to show conduct in conformity therewith, or whether it is presented for a legitimate other purpose, and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, Evid.R. 403. However, "the rule affords broad discretion to the trial judge regarding the admission of other acts evidence." [*Williams*] at ¶ 17.

*Tench* at ¶ 139, citing *Williams* at ¶ 20.

{¶ 28}  The Supreme Court also stated in *Tench*: " '[e]rror in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction.' "  *Id.* at ¶ 177, quoting *State v. Lytle*, 48 Ohio St.2d 391 (1976), paragraph three of the syllabus.  "[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming."  *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 32.  Furthermore, the Supreme Court and this court have stated that limiting instructions, which the jury is presumed to follow, reduces the chance that a defendant would have been materially prejudiced by the admission of testimony, even if improper. *State v. Peterson*, 10th Dist. No. 12AP-646, 2013-Ohio-1807, ¶ 23, citing *Williams* at ¶ 24 (a limiting of instruction lessens prejudicial effect of other-acts evidence); *State v. Bey*, 85 Ohio St.3d 487, 491 (1999) (same).

{¶ 29} We find that error, if any, in admitting into evidence other-acts evidence—in the form of references to K.T. and the previously dismissed charge—was harmless. Taking into consideration that P.T. and T.A. personally testified and were cross-examined, the content of P.T. and T.A.'s testimony, as well as the testimony of their mother, social workers Lampkins and Wilkinson, nurse Gayle Horner, and Detective David Phillips, we conclude there is no reasonable possibility that the testimonies contributed to appellant's conviction. Even when removing all references to K.T. and the previously dismissed charge, the evidence is overwhelming.

{¶ 30} Accordingly, we overrule the fourth assignment of error.

## B. Assignment of Error I:
### The Trial Court Did Not Abuse its Discretion in Denying Appellant's Numerous Motions for Mistrial and New Trial

{¶ 31} In the first assignment of error, appellant argues the trial court abused its discretion when it failed to grant a mistrial. Appellant filed a motion for new trial and requested the court grant a mistrial on July 19, 2017, and repeatedly made oral motions for mistrial throughout trial. He renewed his motions at the conclusion of the state's evidence, upon resting his own case and after the court recalled Detective Phillips. Appellant argues the trial court abused its discretion when it failed to grant a mistrial when: (1) the court and the parties were made aware that the mother of the prosecuting witnesses had provided underwear with unusual stains and discoloration to Detective Phillips, the underwear were not disclosed to the defense, and were subsequently destroyed after the first trial—while the appeal was pending and before commencement of the second trial, (2) the prosecution failed to disclose the results of counselling, which one of the prosecuting witnesses testified she engaged in as a result of the abuse, and (3) the court admitted evidence of uncharged conduct.

{¶ 32} "A trial court must declare a mistrial only 'when the ends of justice so require and a fair trial is no longer possible.' " *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 198, quoting *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). An appellate court reviews an order denying a motion for a mistrial for abuse of discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). To show an abuse of discretion, the defendant must demonstrate material prejudice. *Adams* at ¶ 198, citing *State v. Sage*, 31 Ohio St.3d 173, 182 (1987).

## 1. Destruction of Underwear

{¶ 33} During trial, the court and parties became aware that the mother of the two prosecuting child witnesses had preserved three pairs of underwear worn by P.T. and T.A. which had unusual stains and discoloration. Upon learning of this, sua sponte, pursuant to Evid.R. 614, the trial court recalled Detective Phillips after the parties had rested. Detective Phillips testified that none of the underwear were subjected to forensic testing because the prosecuting witnesses and appellant lived together and there would have been transference from dirty clothes which would render DNA moot. Detective Phillips testified that after notifying the mother she could retrieve the underwear, when she did not retrieve them, in accordance with policies and procedures of the Columbus Division of Police, the underwear were destroyed on July 13, 2015. Appellant argues the trial court abused its discretion in not granting a mistrial upon learning of the non-disclosure and destruction of the underwear.

{¶ 34} In *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 73, the Supreme Court stated:

> Specific tests are applied to determine whether the state's failure to preserve evidence rises to the level of a due process violation. The test depends on whether the lost or destroyed evidence involves "material exculpatory evidence" or "potentially useful evidence."

{¶ 35} In *California v. Trombetta*, 467 U.S. 479 (1984), the United States Supreme Court held the government violates a defendant's due process rights when material exculpatory evidence is not preserved. Evidence is constitutionally material when it possesses "an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. The defendant bears the burden to show the evidence was materially exculpatory. *See State v. Jackson*, 57 Ohio St.3d 29, 33 (1991).

{¶ 36} In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the United States Supreme Court reviewed a case in which the state had failed to properly preserve semen samples and clothing obtained from a child victim of sexual assault. A police criminologist performed testing on the evidence but was unable to identify the assailant. *Id.* at 53-54. Expert witnesses testified at trial that the defendant might have been completely exonerated by timely performance of tests on properly preserved semen samples. *Id.* at 54. The defendant was convicted of child molestation, sexual assault, and kidnapping. *Id.* at 52. The Arizona

Court of Appeals reversed the conviction on the ground that the state had breached a constitutional duty to preserve the semen samples. *Id.*

{¶ 37} The United States Supreme Court reversed the Arizona Court of Appeals, stating:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady* [*v. Maryland*, 373 U.S. 83 (1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

*Id.* at 57. In that situation, the court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. *See also Illinois v. Fisher*, 540 U.S. 544, 545 (2004).

{¶ 38} *Youngblood* made a clear distinction between materially exculpatory evidence and potentially useful evidence. "If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, ¶ 10.

{¶ 39} "The term 'bad faith' generally implies something more than bad judgment or negligence." *State v. Tate*, 5th Dist. No. 07 CA 55, 2008-Ohio-3759, ¶ 13. " 'It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.' " *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (1983), quoting *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148 (1962), paragraph two of the syllabus.

{¶ 40} The facts before us regarding the destruction of underwear are similar to the facts in *Youngblood* wherein the United States Supreme Court concluded the state's failure to preserve and properly test clothing obtained from a child victim of sexual assault was not materially exculpatory but only potentially useful. The court emphasized in *Youngblood* that "no more can be said than that [the clothing] could have been subjected to tests, the results of which *might* have exonerated the defendant." (Emphasis added.) *Id.* at 57.

Likewise, here, because the underwear were not tested before being destroyed, no more can be said than that it could have been subjected to tests and the results might have exonerated appellant. But the results might not have exonerated appellant. Rather, the results might have provided forensic evidence in support of finding appellant guilty. There was no way for the trial court to know and no way for this court to know. Appellant argues it is not speculation because the underwear contained stains and discoloration. Even if we were to accept that the stains and discoloration were evidence of semen or other bodily fluids other than the prosecuting witnesses, it is pure speculation as to who was the source of the semen or bodily fluids. We cannot say the underwear were materially exculpatory evidence.[9]

{¶ 41} Furthermore, assuming, arguendo, that the evidence was potentially useful, appellant did not show bad faith on the part of the state. Upon being recalled as a witness, Detective Phillips testified the underwear were destroyed on July 13, 2015 in accordance with policies and procedures of the police department. He testified the mother of the prosecuting witnesses had contacted him and informed him she found the underwear in some dirty laundry and wanted to turn them over to police. He testified he did not test the underwear because appellant lived with the prosecuting witnesses and there would have been transference from dirty clothes that he felt would have rendered the DNA moot. Appellant did not point to any place in the record where he raised an argument of bad faith before the trial court, and we are unable to find any such argument, neither upon first learning of the non-disclosure and destruction of the untested underwear, nor after examining Detective Phillips regarding the same. Defense exhibit B, a copy of the police property inventory form, indicates that on January 3, 2015, a letter was sent to mother informing her the evidence was to be released and destroyed. This exhibit is consistent with the testimony of Detective Phillips.

{¶ 42} Finally, it is important to note the trial court recalled Detective Phillips as the court's own witness, and in the presence of the jury examined Detective Phillips and gave the state and appellant an opportunity to examine and cross-examine him as well.

{¶ 43} With all this in mind, on these grounds, we cannot say the trial court abused its discretion in denying appellant's motions for mistrial and new trial. Furthermore, given that the underwear had not been tested, as well as the fact that the court permitted the

---

[9] The transcript reveals that upon learning of the existence of and destruction of the underwear, appellant's attorney stated to the judge "[t]hat is *potentially* exculpatory evidence typically to show --*potentially* exculpatory evidence for a variety of different reasons." (Emphasis added.) (July 19, 2017 Tr. Vol. II at 220.)

parties to re-examine Detective Phillips, we cannot say appellant was materially prejudiced thereby.

### 2. Results of Counseling

{¶ 44} Upon direct examination, the prosecutor asked P.T. if she had talked to counselors. P.T. responded she had. Appellant objected and informed the court that the state had never disclosed any records of counseling and that he was entitled to know what was said to the counselor, how the counselor assessed the statements, and to test whether or not what P.T. stated to the counselor was consistent with her testimony. The state indicated it did not intend to get into the content of the counseling. The prosecutor indicated he anticipated appellant would inquire why P.T. never talked to anyone about appellant's abuse and, therefore, asked the question so P.T. could address why it was easier to talk about it now. The court instructed the prosecutor to end the line of questioning and the prosecutor agreed. The court denied appellant's motion to strike and his renewed motion for mistrial.

{¶ 45} Appellant argues that, on these grounds, the trial court abused its discretion in denying his motions for mistrial and new trial because he was entitled to the results of any physical or mental examinations, pursuant to Crim.R. 16(B)(4), and his due process rights were violated because the non-disclosure was fundamentally unfair. We disagree. We also note appellant points to no discussion in the record regarding the content of P.T.'s communications with the counselor.

{¶ 46} Given the limited context of the prosecutor's question and P.T.'s answer, we do not find the trial court abused its discretion in denying the motion for mistrial on these grounds. Furthermore, we find appellant was not materially prejudiced thereby.

### 3. Evidence of Uncharged Crimes

{¶ 47} Appellant renewed the motion for mistrial prior to and during the playing of the video interview of T.A. on grounds there were references to K.T. being touched and also on grounds that T.A. told the interviewer that P.T. told appellant to stop abusing T.A. The court denied the motion for mistrial reasoning that the real issue in this case is whether the jury believes the two prosecuting child witnesses.

{¶ 48} In our discussion of the fourth assignment error, we thoroughly discussed the facts and context of P.T. and T.A.'s references to K.T. We noted the trial court gave a curative instruction to the jury to disregard any statements with regard to K.T. We note here, however, that appellant withdrew his request for additional other-acts instructions

when the parties discussed the jury instructions with the court. Applying the standard of review for denial of a mistrial to the same facts and context, and having reviewed appellant's specific objections raised before the trial court in this context at pages 749 through 751 of the transcript, we do not find the trial court abused its discretion in denying the motion for mistrial on these grounds. (July 21, 2017 Tr. Vol. IV.) Furthermore, taking into consideration the detailed testimony of P.T. and T.A. regarding the abuse appellant perpetrated against them specifically, without reference to K.T., we do not find appellant was materially prejudiced thereby.

{¶ 49} Accordingly, we overrule the first assignment of error.

## C. Assignment of Error II:

## Prosecutorial Conduct Did Not Deprive Appellant of a Fair Trial and Due Process

{¶ 50} In his second assignment of error, appellant argues the state went overboard in repeatedly eliciting testimony regarding alleged incidents outside the scope of the indictment. Specifically, appellant argues: (1) the prosecutor exploited every opportunity to have the jury hear testimony relating to the charge against appellant regarding K.T. which was dismissed prior to trial, (2) the prosecutor solicited information regarding additional uncharged accusations involving T.A., (3) the prosecutor failed to comply with the trial court's limiting instruction to exclude testimony or recordings relating to K.T., and (4) the prosecutor made improper comments and vouched for the credibility of the witnesses in his closing argument.

{¶ 51} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 364, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). The touchstone of the analysis " 'is the fairness of the trial, not the culpability of the prosecutor.' " *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶ 52} When reviewing a claim of prosecutorial misconduct, " '[t]he relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' " *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 257, quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "To answer that question, we consider whether the conduct was improper and whether it prejudicially affected the defendant's substantial rights." *Id.*, citing *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-

1019, ¶ 243. In evaluating prejudice, we determine the effect of the misconduct "on the jury in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993), citing *Donnelly* at 643-45.

### 1. Evidence Regarding Dismissed Charge Involving K.T.

{¶ 53} Appellant alleges the prosecutor engaged in misconduct by exploiting opportunities to have the jury hear evidence regarding a dismissed charge involving K.T. Here again, as he argued in his first and fourth assignments of error, appellant takes issue with the presentation of evidence involving alleged abuse by appellant against K.T. As noted in our discussion regarding the fourth assignment of error, it does appear the prosecutor agreed to appellant's request to redact specific portions of the video testimony which addressed alleged abuse by appellant against K.T. Nevertheless, whether intentionally or inadvertently, portions of the video interview were played which referenced K.T.

{¶ 54} Here, it is important to note the prosecutor made several requests of the trial judge to listen to the video and instruct the prosecutor specifically which portions of the video interview should be redacted. Furthermore, the trial court did make a ruling that any reference to K.T. was harmless.

{¶ 55} "[I]t is not prosecutorial misconduct to introduce evidence that the trial court has determined to be admissible." *State v. Perez*, 124 Ohio St.2d 122, 2009-Ohio-6179, ¶ 187. With this in mind, we cannot say the prosecutor engaged in prosecutorial misconduct on these grounds. Furthermore, considering the context of the entire trial, we cannot say the prosecutor's actions prejudicially affected appellant's substantial rights.

### 2. Evidence Regarding Uncharged Accusations Involving T.A.

{¶ 56} Appellant argues the indictment only charged him with seven counts as to T.A., yet the prosecutor goaded T.A. into testifying about more than ten alleged incidents. The prosecutor did present T.A. with some leading questions about how many times appellant abused her. Upon appellant's objection, the court noted that because T.A. was a child witness, he would give the prosecution some leverage to lead a little bit but not throughout all the incidents. The prosecutor resumed questioning in a general, open-ended manner regarding the details of the alleged incidents.

{¶ 57} Prosecutorial misconduct can occur when a prosecutor continues to ask leading questions even after the trial court has sustained objections on that basis. *McKelton* at ¶ 265. However, here, the transcript reveals that after the prosecutor was cautioned by

the court, he curtailed the leading nature of his questions.  With this in mind, we cannot say the prosecutor engaged in prosecutorial misconduct on these grounds.  Furthermore, considering the context of the entire trial, we cannot say the prosecutor's actions prejudicially affected appellant's substantial rights.

### 3.  Compliance with Limiting Instruction on Evidence Regarding K.T.

{¶ 58}  As noted in our discussion of the fourth assignment of error, the court gave the jury a limiting instruction: "Ladies and gentlemen, I am going to specifically instruct you that you are instructed to disregard and they are not evidence and must be treated as if you never heard any statements with respect to [K.T.].  Okay."  (July 21, 2017 Tr. Vol. IV at 670.)  Appellant argues that despite this limiting instruction to the jury, the prosecutor persisted in eliciting impermissible evidence regarding K.T.

{¶ 59}  T.A. had already testified by this point, so we cannot say the prosecutor was eliciting live testimony from T.A. in violation of the limiting instruction.  But, it is true that the video interview of T.A. was being played for the jury and, as noted, the video intentionally or inadvertently contained references to K.T.  Nevertheless, the court had determined the video interview could be played and any references to K.T. were harmless.  Furthermore, the court gave a curative instruction to not consider any references to K.T.

{¶ 60}  Curative instructions are presumed to be an effective way to remedy errors that occur during trial.  *State v. Brown*, 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 21, citing *Treesh* at 480.  The jury is presumed to follow any such instructions.  *Id.*  With this in mind, we cannot say the prosecutor engaged in prosecutorial misconduct on these grounds.  Furthermore, considering the context of the entire trial, we cannot say the prosecutor's actions prejudicially affected appellant's substantial rights.

### 4.  Comments Regarding Credibility During Closing Argument

{¶ 61}  Appellant objected to the prosecutor's statement at closing, while referencing Counts 1 through 15, that "[i]f they were not valid, you wouldn't be here, we wouldn't all be here."  (July 21, 2017 Tr. Vol. IV at 768.)  However, the prosecutor went on to state the jury should consider each one of the charges; reminded the jury that "it is for you to consider.  And you should consider them independently."  (July 21, 2017 Tr. Vol. IV at 769.)

{¶ 62}  " 'For a prosecutor's closing argument to be prejudicial, the remarks must be so inflammatory as to render the jury's decision a product solely of passion and prejudice.' "  *Ford* at ¶ 385, quoting *State v. Williams*, 23 Ohio St.3d 16, 20 (1986).  To determine whether the remarks were prejudicial, we must review the closing argument in its entirety.

*Id.*, citing *State v. Slagle*, 65 Ohio St.3d 597, 607 (1992); *State v. Moritz*, 63 Ohio St.2d 150, 157 (1980).

{¶ 63} With this in mind, we cannot say the prosecutor engaged in prosecutorial misconduct on these grounds. Furthermore, considering the prosecutor's closing argument in its entirety, we cannot say the prosecutor's actions prejudicially affected appellant's substantial rights.

{¶ 64} Accordingly, we overrule the second assignment of error.

## D. Assignment of Error III:

## The Trial Court Did Not Err in Refusing to Give Instruction on Spoliation of Evidence

{¶ 65} In his third assignment of error, appellant argues the trial court erred by refusing to instruct the jury regarding the spoliation of evidence to address the untested underwear which were destroyed between the first and second trials. Appellant proposed to the trial court two alternative instructions regarding spoliation of evidence:

> [1] You have heard evidence that certain items of evidence in custody of the Columbus police were later destroyed prior to trial. You may, but are not required to infer that such evidence was adverse to the interest of the prosecution. * * * [2] The State of Ohio, Columbus police department had a duty to retain the three pairs of underwear. The State of Ohio and Columbus police department had destroyed that evidence. Therefore, you may, but are not required to consider that this evidence would have been unfavorable to the State of Ohio on the issue of the defendant's guilt to which the evidence would have been relevant.

(July 21, 2017 Tr. Vol. IV at 738-39.)

{¶ 66} The trial court denied appellant's request because the underwear were untested and, therefore, no inference could be made either way for exculpation or inculpation. Appellant objected to the trial court's denial of the instruction. " ' "Trial courts have the responsibility to give all jury instructions that are relevant and necessary in order for the jury to properly weigh the evidence and perform its duty as the fact-finder." ' " *State v. Kearns*, 10th Dist. No. 15AP-244, 2016-Ohio-5941, ¶ 30, quoting *State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 33, quoting *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 51 (10th Dist.). However, when reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts

and circumstances of the case. *Id.*, citing *State v. Rawson*, 10th Dist. No. 14AP-1023, 2016-Ohio-1403, ¶ 19, citing *State v. Stewart*, 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 9, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989).

{¶ 67} Furthermore, " '[a]n appellate court will not reverse a conviction in a criminal case due to jury instructions unless it finds that the jury instructions amount to prejudicial error.' " S*tate v. Dodson*, 10th Dist. No. 10AP-603, 2011-Ohio-1092, ¶ 6, quoting *Aleshire* at ¶ 52.

{¶ 68} This court uses a three-part test to determine when failing to give a requested instruction constitutes reversible error: (1) the requested instruction must be a correct statement of the law, (2) the requested instruction must not be redundant of other instructions, and (3) failure to give the requested instruction must have impaired the requesting party's theory of the case. *Kearns* at ¶ 30-31, citing *Dodson* at ¶ 6, citing *Gower v. Conrad*, 146 Ohio App.3d 200, 203 (10th Dist.2001).

{¶ 69} The trial court denied the request for an instruction, noting:

> The spoliation OJI jury instruction, it does not apply in this, because that makes an inference that something -- I mean, these are panties that were obtained, never tested, so there is no inference you can make on way or another -- and destroyed. So there is no evidentiary value both either for exculpation or inculpation. And I think it is for if they would have, you know, took a sample of dirt and thrown it away. So I am not going to give the spoliation instruction.

(July 21, 2017 Tr. Vol. IV at 740.)

{¶ 70} We agree with the trial court that an inference cannot be made either way from the destruction of the underwear because they were not tested. Appellant cannot show that failure to give the requested instruction impaired his theory of the case. Therefore, we find the trial court did not abuse its discretion in refusing to include the proposed jury instructions on spoliation and such denial did not result in prejudice to appellant.

{¶ 71} Accordingly, we overrule the third assignment of error.

## E. Assignment of Error VI:

**The Trial Court Did Not Violate Appellant's Due Process Rights Through Cumulative Error**

{¶ 72} Under the cumulative-error doctrine, a judgment may be reversed if the cumulative effect of multiple errors deprives a defendant of his constitutional rights even

though, individually, the errors may not rise to the level of prejudicial error or cause for reversal. *See Garner* at 64.

{¶ 73} A defendant claiming cumulative error "must make 'a persuasive showing of cumulative error.' " *State v. Givens*, 7th Dist. No. 07 CO 31, 2008-Ohio-3434, ¶ 97, quoting *State v. Sanders*, 92 Ohio St.3d 245, 279 (2001).

{¶ 74} As we do not find the trial court committed error or that prejudice resulted from error, if any, we cannot find the trial court committed cumulative error.

{¶ 75} Accordingly, we overrule the sixth assignment of error.

## F. Assignment of Error V:

## Sufficient Evidence and Manifest Weight of the Evidence Supported the Conviction

{¶ 76} In the fifth assignment of error, appellant argues the state did not present sufficient evidence to support the convictions and the manifest weight of the evidence does not support the convictions. We disagree.

{¶ 77} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. The Supreme Court delineated the role of an appellate court presented with a sufficiency of the evidence argument in *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

{¶ 78} Whether the evidence is legally sufficient is a question of law, not fact. *Thompkins* at 386. The standard for sufficiency of the evidence gives "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Consequently, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79; *State v. Thomas*, 70 Ohio St.2d 79,

80 (1982). A verdict will not be disturbed unless, after viewing the evidence in the light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *Treesh* at 484; *Jenks* at 273.

{¶ 79} A manifest weight of the evidence claim requires a different review. The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Brindley*, 10th Dist. No. 01AP-926, 2002-Ohio-2425, ¶ 16. When presented with a challenge to the manifest weight of the evidence, an appellate court, after " 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 80} A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. Neither is a conviction against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version. *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19; *State v. Williams*, 10th Dist. No. 08AP-719, 2009-Ohio-3237, ¶ 17. The trier of fact is free to believe or disbelieve all or any of the testimony. *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257; *State v. Sheppard*, 1st Dist. No. C-000553 (Oct. 12, 2001). The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58; *State v. Clarke*, 10th Dist. No. 01AP-194 (Sept. 25, 2001). Consequently, an appellate court must ordinarily give great deference to the factfinder's determination of the witnesses' credibility. *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 28; *State v. Hairston*, 10th Dist. No. 01AP-1393, 2002-Ohio-4491, ¶ 74.

{¶ 81} Appellant argues his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence because they are supported by the uncorroborated testimony of the two prosecuting child witnesses and there was no physical

evidence to back up their testimony. Appellant also argues the testimony of the detective, the forensic examiners, and the nurse were all based on the same limited presentation. Appellant further argues the evidence was not specific enough regarding when the alleged offenses occurred. Finally, appellant argues the fact that the two prosecuting child witnesses discussed the matter amongst themselves and likely could have been "mimicking accounts they heard about, but did not experience." (Appellant's Brief at 48.) We reject all these arguments and find, based on the evidence presented, in particular the live testimony and video interviews of the two prosecuting child witnesses, that the convictions were supported by the manifest weight of the evidence.

### 1. Evidence Supporting Conviction on Offenses Against P.T.

{¶ 82} As noted previously, P.T. testified on direct and cross-examination. On direct, P.T. testified the abuse began when she was nine years old and the first time appellant vaginally raped her: "my body shook a lot and I didn't really understand what was going on. But I knew it wasn't right and I was crying once I went to the restroom because I was scared. I didn't know what had happened." (July 20, 2017 Tr. Vol. III at 416.) P.T. testified she was scared: "I was -- I was very little then, so he is way bigger than me, and it intimidated me, and his voice was very aggressive." (July 20, 2017 Tr. Vol. III at 422.)

{¶ 83} P.T. testified appellant repeatedly raped her—at one point it was "[o]n average," "in a week it would happen three times" or "very often"—at night, every time her mother was away or at work. (July 20, 2017 Tr. Vol. III at 420, 444.) P.T. stated appellant vaginally raped her, made her put his penis in her mouth, touched her breasts, and buttocks, and he showed her porn. He did this in the bed he shared with her mother, in P.T.'s bed, on the couch, in the kitchen behind the refrigerator, and in the basement, all at three different addresses.

{¶ 84} P.T. testified that on many occasions she resisted and told appellant no and tried to leave or go back to her sisters, but appellant would aggressively pull her back, push her down, and get on top of her.

{¶ 85} P.T. testified: "I was always confused by what was going on and tried to, like, find a way to speak, but I didn't exactly know how to come out about it and speak on it, because it made me feel embarrassed because I know it was wrong, and I just didn't know how to help myself." (July 20, 2017 Tr. Vol. III at 430.)

{¶ 86} P.T. testified regarding why she did not tell her mother:

Q. And why not? Why didn't you tell her that you wanted out of there?

A. Because I was always told by [appellant] if I was to speak on anything that was occurring, that ACS, a children's services company, would take me and my sisters away from my mother, because they would consider her keeping us in bad conditions.

I was told that my uncle * * * that I am close with, that he would be hurt if I ever told him.

There was a time that I went to visit my dad and I was talking to my mom, and he asked to have the phone. * * * And he said to me, "If you speak to anybody there, I will harm your sisters and mother and you will come back to nobody."

Q. How did that make you feel, hearing him tell you those things?

A. It scared me and made me feel that I had to protect my family by not speaking to anyone.

Q. Is that why you didn't tell anybody?

A. Yes. And I was also told that if I did, I would be sent back to his home country, Eritrea - - I am not sure if I am pronouncing it right - - but he would send me back to there, with him.

Q. Okay. Did you want to do that or see that happen to you?

A. No.

Q. Did you want to see your sisters or family hurt?

A. No.

Q. Were you worried or concerned that if you told, that you would become homeless?

A. Yes, very much.

[Appellant's trial counsel]: Objection as to leading.

THE COURT: Rephrase the question.

Q. [Prosecuting attorney]: What were you worried about if you told what [appellant] was doing? What were you worried about that could happen to where you live?

A. I was worried that me and my sisters, we would be harmed because we wouldn't have no type of support or any type of help.

(July 20, 2017 Tr. Vol. III at 444-46.)

{¶ 87} Appellant had the opportunity to cross-examine P.T., and during cross-examination appellant's counsel questioned P.T. about the number of different people who lived with her, her family, and appellant over the period of time appellant abused P.T.; about the fact that P.T. and her family at one point lived in a hotel and a family shelter; her close relationship and visits with her father; good relationships with her mother and her aunt; school, extracurricular activities and church; relationships with coaches, teachers, and her pastor; conversations with her mother about stranger danger and prior incidences of molestation in her family; about the computer account she shared with her sisters; whether she had observed her mother in a relationship with another person; and whether appellant helped her with her homework, took her to father-daughter dances, celebrated 4th of July, her birthday, family baptisms, and Father's Day.

{¶ 88} Appellant's counsel also inquired whether P.T. could tell him what specific day of the week the abuse occurred and what time of day it occurred. Specifically, counsel asked whether P.T. could give a date, time, and year for each of the specific instances to which she testified. P.T. replied she could not, except to say that it happened during nighttime.

{¶ 89} Appellant's counsel examined P.T. specifically regarding the video interview and inquired whether she was restricted from what she could say then and whether she was led to believe at that time that she would need to testify in a certain manner. P.T. replied she was not led to believe that and confirmed she was not restricted:

Q. Is there any point in time in which your mother said anything to you that would lead you to believe that you need to testify in this case in a certain manner?

A. No.

Q. When you met - - okay, this is 2017. When you met four years ago with the Child Advocacy Center, you were in a room alone with a lady. Do you remember that?

A. Yes.

Q. And you were asked questions about what happened.

A. Yes

Q. And you responded to those questions, didn't leave anything out?

A. Correct.

Q. Correct?

A. Yes.

Q. You did not - - you were not restricted from what you could say; am I correct?

A. Yes.

Q. And, in fact, there were several times in which you were asked, "Is there anything else that you need to tell me?" Do you remember that?

A. No.

Q. Okay. Did you feel at any point in time in that interview that you could not say what you wanted to say?

A. No.

Q. Did you feel at any time during that interview that you were limited as to what you could say?

A. No.

Q. Did you at any time during that interview feel that you were not being given enough time to say what you wanted to say?

A. No.

Q. And, in fact, if there was something during the course of that interview that you wanted to go back to or add to or correct, you had that opportunity?

A. Can you rephrase?

Q. Okay. If at any time during that interview there was something that you wanted to add to what you had already said, you had that opportunity to do so, correct?

A. I don't remember.

Q. You don't remember? If there was something there that was incorrect, you had an opportunity to correct it?

A. No.

Q. You did not?

A. There was nothing to correct.

Q. I can't hear you.

A. There was nothing to correct.

Q. I understand that is what you are saying, but my question is, if you needed to correct something, you could have had that opportunity, right?

A. I don't know.

Q. In other words, you were free - -

[Prosecuting attorney]: Objection, asked and answered.

THE COURT: He can finish the question.

[Appellant's trial counsel]: Thank you.

Q. You were free to say anything that you wanted during the time of that interview?

A. Yes.

Q. And you were not being rushed?

A. No.

(July 20, 2017 Tr. Vol. III at 477-80.)

{¶ 90} The discrepancy between P.T.'s testimony and video interview was minor—whether it was appellant or appellant's friend who gave her $20 when she was upset about a visit with her father—and appellant had the opportunity to cross-examine her regarding the same.  The jury had the opportunity to consider the discrepancy as well.

{¶ 91} P.T. testified she never told her mother and had concerns about telling others "[b]ecause [she] was always hit with threats of if [she] spoke, [she] would be taken from [her] mom." (July 20, 2017 Tr. Vol. III at 488.)

{¶ 92} State's exhibit 17 is the video interview of P.T. by social worker Lampkin. Lampkin also testified and was cross-examined. During the interview, P.T. testified appellant's conduct began with digital penetration and progressed to intercourse. She testified that when he would finish, some liquid stuff would come out of his "[m]iddle part" or "pee-pee." (July 17, 2017 Tr. Vol. I at 174-75, 203-04.) She further testified appellant forced her to perform fellatio at least five times and that dirty, yellowish stuff would come out of his pee-pee into her mouth.

### 2. Evidence Supporting Conviction on Offenses Against T.A.

{¶ 93} T.A. also testified and was subject to cross-examination:

Q. And at that point you felt like you could talk about it with her?

A. Not really, but I did.

Q. Okay. Well, why didn't you - - why were you still apprehensive and not really feel like you could talk to your mom?

[Appellant's trial counsel]: Objection as to the form of the question.

THE COURT: What is that?

[Appellant's trial counsel]: Objection as to the characterization.

THE COURT: What was the question?

(Question read.)

THE COURT: Overruled.

Q. You can answer that question. The Judge said you can answer that question.

A. Because, like, I wasn't - - well, yeah, I was kind of scared.

Q. What made you scared to talk about it?

A. Because I didn't want them to get hurt or something.

Q. You didn't want who to get hurt?

A. My sisters and my mom and uncle, dad.

Q. Why would you think that your sisters or your mom or your uncle or your dad would be hurt?

A. Because that is what he said; or like he would say, like, that if we told, like, we would get taken away. That is what he said to my big sister.

Q. And did you think you would be taken away if you told?

A. Yeah.

Q. And when you say, "taken away," what did you think in your head would happen to you if you told somebody what had been going on?

A. I just thought we would get, like, split up.

Q. I'm sorry?

A. Like when I said taken away, I thought we would get, like, split up or something.

Q. Split up? When you say, "split up," does that mean you would be taken away from your sisters?

A. Yeah.

Q. You would be taken away from your mother?

A. Uh-huh.

Q. Who are the most important people in your life?

A. My mom and my sisters.

Q. Any other reasons you didn't tell your mom before that day she took you on this walk?

A. Yeah, I was just scared. I didn't want them to get hurt or anything.

(July 20, 2017 Tr. Vol. III at 505-07.)

{¶ 94} T.A. testified she was scared to tell her mother. She stated: "[h]e would say he was going to hurt us if we told." (July 20, 2017 Tr. Vol. III at 524.) T.A. testified appellant told her he was going to hurt people with knives if she told anyone. T.A. was emotional and cried during her testimony.

{¶ 95} T.A. testified that while her mother was at work, at nighttime, appellant would touch her on her chest, below her waist, and touched her vagina. T.A. testified appellant's hands and his private part went inside her vagina and it hurt a lot. T.A. testified that twice appellant put his private part in her mouth. When appellant's penis was in her mouth she felt like she was going to throw up but she could not talk because his penis was in her mouth. T.A. testified appellant also tried to put his private part in her butt.

{¶ 96} T.A. testified she would resist by telling him "stop" or "no, I didn't want it." (July 20, 2017 Tr. Vol. III at 524.) Appellant did not stop. T.A. told him "loud" and she "kn[ew] he could hear [her]," that she did not want to do it, "[he] was right next to me." (July 20, 2017 Tr. Vol. III at 536.)

{¶ 97} T.A. testified it happened "a lot" but she did not count how many times because she did not want to, she testified she "just wanted to forget it." (July 20, 2017 Tr. Vol. III at 524.)

{¶ 98} T.A. testified it happened on the couch or on the floor beside the couch and that it happened only at Lakeside.

{¶ 99} On cross-examination, T.A. also testified regarding her video interview:

Q. And you had an opportunity to tell the lady that you were speaking with any and everything that you wanted to, correct?

A. Yeah.

Q. You were not restricted in any way from saying what you felt to be important?

A. Uh-huh.

Q. Correct?

A. Yeah.

Q. There were no time limits in terms of what you could say; am I right?

A. Yeah.

Q. You had as much time as you needed?

A. Yeah.

Q. And if you needed to correct anything, you had that opportunity as well; is that correct?

A. Can you rephrase that question?

Q. If you had said something and then you later thought that maybe I had that wrong, let me go back and correct something, you had that opportunity to do that, right?

A. No.

Q. You didn't have any opportunity to change what you had to say?

A. No. I just spoke to her.

(July 20, 2017 Tr. Vol. III at 565-66.)

{¶ 100} State's exhibit 16 is a video interview of T.A. by social worker Wilkinson. T.A.'s responses to Wilkinson were much more detailed and graphic than her live testimony. Wilkinson also testified and was cross-examined.

{¶ 101} In the video interview, T.A. also told Wilkinson appellant had used his finger to touch her pee-pee and had put duct tape over her mouth so no one would hear her scream. T.A. stated this happened in the bathroom. She also stated in the interview that it happened at Dublin-Granville Road and at the house of a friend of appellant. She informed Wilkinson appellant put his pee-pee in her mouth more than one time. She stated his pee-pee was in her pee-pee not on it, but inside. "I kept telling him that he was hurting me, but he kept saying, 'I don't care.' " (July 21, 2017 Tr. Vol. IV at 697.) She told Wilkinson appellant showed her porn. T.A. also stated in the interview that appellant put his penis in her butt several times and that pee or "white stuff" came out when this happened. (July 21, 2017 Tr. Vol. IV at 702.)

### 3. Testimony from P.T. and T.A.'s Mother Supporting Convictions on Offenses Against P.T. and T.A.

{¶ 102} The mother of P.T. and T.A. also testified. She testified she lived on Beechworth Drive with appellant until July 2011 when she obtained a place of her own on Dublin-Granville Road. She resided on Dublin-Granville Road until 2013, but appellant would occasionally stay the night during that period. She moved in with appellant again at his place on Lakeside Street when she lost her job and was no longer able to afford her own place. Mother testified that when she and appellant lived together, she often worked overnight and appellant was home alone with the children.

### 4. The Sufficient Evidence and the Manifest Weight of the Evidence Supports the Convictions

{¶ 103} Appellant was convicted of 4 counts of gross sexual imposition, felonies of the third degree, and 11 counts of rape, felonies of the first degree. The offenses were alleged to have occurred at three separate residential locations (Beechworth Drive, Dublin-Granville Road, and Lakeside Street).

{¶ 104} Regarding the offenses against P.T., Counts 1 and 2 charged appellant with gross sexual imposition between September 4, 2010 to September 3, 2011; and between September 4, 2010 to September 3, 2012. Counts 3, 4, and 7 charged rape by vaginal penetration between September 4, 2011 to September 3, 2012; between September 4, 2011 to September 3, 2012; and between January 1 to March 1, 2013. Counts 5, 6, and 8 charged rape by fellatio between September 4, 2010 to December 31, 2012; and between January 1 to March 1, 2013.

{¶ 105} Regarding offenses against T.A., Counts 9 and 10 charged appellant with gross sexual imposition between April 1, 2012 to March 1, 2013; and August 1, 2011 to January 31, 2013. Counts 13, 14, and 15 charged rape by vaginal penetration between April 1, 2012 to March 1, 2013. Counts 11 and 12 charged rape by fellatio between August 1, 2011 to January 31, 2013; and February 5, 2012 to March 1, 2013.

{¶ 106} Rape is prohibited by R.C. 2907.02(A) which states:

> (1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> (a) For the purpose of preventing resistance, the offender substantially impairs the other person's judgment or control by administering any drug, intoxicant, or controlled substance to the other person surreptitiously or by force, threat of force, or deception.
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
>
> (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

{¶ 107}   R.C. 2907.01(A) defines "Sexual conduct" as:

[M]eans vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 108}   Gross sexual imposition is prohibited, in relevant part, by R.C. 2907.05(A) which states:

No person shall have sexual contact with another, nor the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

* * *

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶ 109}   R.C. 2907.01(B) defines "[s]exual contact" as:

[M]eans any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

{¶ 110}   Based on the evidence presented, only some of which is summarized here, we find that sufficient evidence and the manifest weight of the evidence supported the 4 convictions for gross sexual imposition and 11 convictions for rape.

{¶ 111}   Accordingly, we overrule the fifth assignment of error.

**G. Assignment of Error VII:**

**Merger**

{¶ 112}   In his seventh assignment of error, appellant alleges the trial court failed to merge the offenses of which he was convicted.  Appellant points to the bill of particulars and argues that merger was required because the counts allege the same or overlapping timeframes and the testimony was broad and vague in this regard.  Appellant further argues that gross sexual imposition and rape are allied offenses pursuant to R.C. 2941.25(A) and gross sexual imposition is also a lesser-included offense of rape.

{¶ 113}   Specifically, appellant argues the offenses should merge as follows:

**1.  Offenses Against P.T.:**

Counts 1 and 2, gross sexual imposition, should merge with each other:

o       Count 1 alleged to have occurred at Beechworth Drive and/or Dublin-Granville Road residences

o       Count 2 alleged to have occurred at Beechworth Drive residence

Counts 3 and 4, rape by vaginal penetration, should merge with each other and should merge with Counts 1 and 2, gross sexual imposition:

o       Counts 3 and 4 alleged to have occurred at Dublin-Granville Road and/or Lakeside Street residences

Counts 5 and 6, rape by fellatio, should merge with each other and should merge with Counts 1 and 2, gross sexual imposition:

o       Counts 5 and 6 alleged to have occurred at Beechworth Drive and/or Dublin-Granville Road residences

**2.  Offenses Against T.A.:**

Counts 9, gross sexual imposition, and 12, rape by fellatio, should merge with each other and should merge with Counts 13, 14, and 15, rape by vaginal penetration:

o       Count 9 alleged to have occurred at Dublin-Granville Road and/or Lakeside Street residences

o       Count 12 alleged to have occurred at Dublin-Granville Road and/or Lakeside Street residences

o        Counts 13, 14, and 15 alleged to have occurred at Dublin-Granville Road and/or Lakeside Street residences

Counts 10, gross sexual imposition, and 11, rape by fellatio, should merge:

o        Count 10 alleged to have occurred at Dublin-Granville Road and/or Lakeside Street residences

o        Count 11 alleged to have occurred at Dublin-Granville Road and/or Lakeside Street residences

{¶ 114}   Ohio's multiple-counts statute provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."   R.C. 2941.25(A).   The statute further provides: "[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."   R.C. 2941.25(B).

{¶ 115}   When it is determined the defendant has been found guilty of allied offenses of similar import, "the trial court must accept the state's choice among allied offenses, 'merge the crimes *into a single conviction for sentencing*, and impose a sentence that is appropriate for the merged offense.' "   (Emphasis sic.)  *State v. Bayer*, 10th Dist. No. 11AP-733, 2012-Ohio-5469, ¶ 21, quoting *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, ¶ 13.   "An appellate court should apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination."   *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 28.

{¶ 116}   In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 13, the Supreme Court stated that R.C. 2941.25(A) allows only a single conviction for conduct that constitutes "allied offenses of similar import."   "But under R.C. 2941.25(B), a defendant charged with multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus."   *Id.* at ¶ 13, citing *State v. Moss*, 69 Ohio St.2d 515, 519 (1982).   The Supreme Court further explained in *Ruff*:

When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. R.C. 2941.25(B).

A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

*Id.* at ¶ 24-26.

{¶ 117} As this court has noted, "[i]t is '[t]he defendant [who] has the burden of proving at the sentencing hearing that he is entitled to merger pursuant to R.C. 2941.25.' " *State v. Terry*, 10th Dist. No. 15AP-176, 2015-Ohio-3847, ¶ 10, quoting *State v. Vargas*, 10th Dist. No. 12AP-692, 2014-Ohio-843, ¶ 17. Both at the trial court level and on appeal, appellant asserted the testimony regarding the various counts of rape and gross sexual imposition was too vague to establish that the separate charges in the indictment related to separate conduct. However, we find the evidence, in particular the testimony and video

interviews of the two prosecuting child witnesses, was very detailed and explicit in establishing the offenses were committed separately and the harm from each incident was separate and identifiable. The evidence thus revealed both that appellant's conduct constituted offenses involving separate victims, that each offense was committed separately, and the harm which resulted from each incident is separate and identifiable.

{¶ 118} Moreover, we reject appellant's argument that his convictions of gross sexual imposition must merge with his convictions of rape because they are allied offenses of similar import or because one is a lesser-included offense of the other. "A defendant may not be convicted of both gross sexual imposition and rape when the counts arise out of the same conduct." *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 68, citing *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, ¶ 143. " 'The corollary, of course, is that a defendant may be convicted of both offenses when the counts arise out of separate conduct.' " *Id.*, quoting *State v. Millhoan*, 6th Dist. No. L-10-1328, 2011-Ohio-4741, ¶ 49, citing *Foust* at ¶ 144-45. Here, as noted above, the testimony was explicit that the conduct constituting the multiple counts of gross sexual imposition was separate and distinct conduct from the conduct constituting the multiple counts of rape.

{¶ 119} For these reasons, we conclude each of the offenses here are of dissimilar import within the meaning of R.C. 2941.25(B) and the trial court did not err in imposing a separate sentence for each offense and in not merging the offenses as appellant has argued.

{¶ 120} Accordingly, we overrule the seventh assignment of error.

## IV. Conclusion

{¶ 121} Accordingly, we overrule appellant's seven assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, J., concurs.
BRUNNER, J., dissents in part and concurs in part.


BRUNNER, J., dissenting in part and concurring in part.

## I. INTRODUCTION

{¶ 122} The majority reaches the conclusion that the trial court did not err by permitting the jury to see the video interviews of P.T. and T.A. and, even if it did err in part, any such error was harmless. I respectfully disagree. In addition to admissible portions,

these videos contained highly prejudicial accusations of voodoo practice, uncharged violence toward animals and persons, and an unprosecuted instance of what amounts to forcible kidnapping and sexual abuse of a small child. To characterize erroneous disclosure of such information to a jury as "harmless," particularly in a case with no physical evidence and where the only witnesses to the offenses were the victims and the defendant, is to twist or ignore common sense concepts of what constitutes unfairly prejudicial "harm" in the context of a trial.

{¶ 123} I would hold the trial court erred as a matter of law when it failed to review videos of forensic interviews of the children before the videos were played in their substantial entirety before the jury. The trial court was required to consider the objective purpose of the statements in the video interviews to determine whether or not they could appropriately be considered to fall under the hearsay exception for "statements for purposes of medical diagnosis or treatment." Evid.R. 803(4). Because the trial court did not review the videos before their introduction and because many of the admitted statements in the video were of a forensic (rather than medical) nature, I would sustain S.A.A.'s fourth assignment of error and reverse and remand for yet another new trial or other resolution by the trial court.

{¶ 124} Based on that resolution, I would therefore also hold S.A.A.'s remaining assignments of error to be either unripe or moot, except insofar as he argues, in his fifth assignment of error, that his convictions were insufficiently supported by the evidence at trial. Even relying solely on the live testimony provided by P.T. and T.A., I agree with the majority that his convictions were sufficiently supported.

## II. RELEVANT FACTS AND PROCEDURAL HISTORY

{¶ 125} Because the majority concludes that any errors in the admission of video statements by the complaining witnesses in the case were harmless in the context of the whole, I find it appropriate to review the relevant evidence and posture of this case in some detail. On April 4, 2013, a Franklin County Grand Jury indicted S.A.A. for 5 counts of gross sexual imposition and 11 counts of rape, based on crimes allegedly perpetrated against 3 young girls in the years 2010, 2011, 2012, and 2013. (Apr. 4, 2013 Indictment in passim.) S.A.A. pled not guilty on April 8, 2013. (Apr. 8, 2013 Plea Form.) However, the next year, following a trial on 15 of the 16 originally indicted counts, the jury found S.A.A. to be guilty of all tried counts. (Apr. 24, 2014 Verdicts.) The 16th count, and the only count involving

the youngest of the three girls, was not tried to completion and was dismissed by the State during trial.  (Apr. 24, 2014 Nolle Prosequi.)

{¶ 126}  In a decision issued on April 14, 2016, this Court reversed S.A.A.'s conviction.  *State v. S.A.A.*, 10th Dist. No. 15AP-852, 2016-Ohio-1553.  This Court found that repeated references by the trial judge and prosecution to the three girls as "victims" prior to the presentation of evidence was tantamount to telling the jury that the allegations were true, despite the presumption of innocence.  *Id.* at ¶ 2-5, 10-11.  The defense failed to challenge these references and also failed "repeatedly to object to questions on direct examination and to huge portions of the State's evidence, including extrajudicial interviews of the girls."  *Id.* at ¶ 3, 8.  The net result of these failures was a finding that defense counsel had rendered constitutionally ineffective assistance of counsel.  *Id.* at ¶ 9.  This inefficacy, combined with the fact that the case hinged entirely on the jury weighing the credibility of S.A.A. and his juvenile accusers, resulted in an unfair trial that required reversal.  *Id.* at ¶ 12.

{¶ 127}  On remand, the defense filed a number of pretrial motions.[10]  Relevant to this appeal, the defense moved to dismiss the indictment as unconstitutionally vague,

---

[10] Though it is not directly relevant to this appeal or my dissent, I note that the defense moved, consistent with this Court's previous decision, that the judge and prosecution refrain from referring to the two alleged victims as "victims."  (Feb. 4, 2017 Mot. in Limine on "Victim.")  The State responded that this Court's prior decision was wrong and should be ignored because it is supposedly "well-settled" that use of the term "victim" is not error.  (Mar. 30, 2017 Memo. Contra at Introduction at 2.)  The prosecution indicated that "[t]he State intends to continue to use the term 'victim' in this case."  (Mar. 30, 2017 Memo. Contra at 2.)  And if that act of defiance were not tolerated by the trial court, the prosecution indicated it would propose that the alleged victims be referred to as "sexual abuse survivor[s]" instead.  *Id.* at 3.  The State also filed a motion in limine, parroting and twisting much of the reasoning contained in our prior decision and requesting that the trial court refrain from referring to the defendant as the "defendant" on the grounds that it would be detrimental to the presumption of innocence.  (Mar. 30, 2017 Mot. in Limine on "Defendant" at 1-2.)  This motion suggested that the trial court instead refer to the defendant as, "Alleged Child Rapist."  *Id.* at 2.  Though this motion was later withdrawn, the memorandum proposing to defy this Court's prior rulings, was not.  (Apr. 6, 2017 Mot. Withdrawn.)

No less an authority than the United States Supreme Court has repeatedly pronounced that presumption of innocence is "that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law."  (Internal quotation marks omitted.)  *In re Winship*, 397 U.S. 358, 363 (1970), quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895); *see also, e.g., Betterman v. Montana*, ___ U.S. ___, 1614 (2016); *Reed v. Ross*, 468 U.S. 1, 4 (1984); *Deutch v. United States*, 367 U.S. 456, 471 (1961).  The State's counsel in the second trial exhibited exceedingly poor judgment and failed to live up to key tenets of Ohio's "A Lawyer's Creed" in not offering respect and courtesy to the Court, in not offering "fairness, integrity and civility" to those involved in the second trial, in "knowingly mak[ing] misleading or untrue statements of fact or law" and in apparently failing to "recognize that [his] actions and demeanor reflect upon our system of justice and our profession" and not conducting himself "accordingly."  The Supreme Court of Ohio, *Professional Ideals for Ohio Lawyers & Judges*, at 4 (Feb. 3, 1997), www.supremecourt.ohio.gov/Publications/AttySvcs/proIdeals.pdf (accessed Sept. 3, 2020).

requested exclusion of videos containing forensic interviews of the two girls whose allegations were the basis of the pending charges, and also requested exclusion of evidence related to alleged sexual crimes that were not the subject of the trial. (Feb. 4, 2017 Mot. to Exclude Forensic Interviews; Feb. 4, 2017 Mot. to Exclude Other Bad Acts; Feb. 6, 2017 Mot. to Dismiss.)

{¶ 128}  Without first reviewing these forensic videos, the trial court issued a preliminary ruling that the State would be allowed to play them at trial, but it pledged to revisit the issue if necessary. (June 29, 2017 Hearing Tr. at 23, 30, filed Jan. 12, 2018.)  In a written decision, the trial court denied the motion to dismiss, ruled on a number of motions not relevant to this appeal, and otherwise reserved judgment on the remaining pretrial motions. (July 12, 2017 Decision & Entry.)

{¶ 129}  On July 17, 2017, trial began for the second time. At trial, seven witnesses testified: the detective who investigated the case, the two social workers who interviewed the children, a nurse who examined the children, the children's mother, and the two girls (who were teenagers at the time of trial).

{¶ 130}  The detective testified first. He said the case was assigned to him on March 6, 2013 when he received notice that two girls, P.T. and T.A., were going to be "forensically interviewed" at the Child Advocacy Center by social workers. (Tr. at 64, 115-16.)[11]  He observed the forensic interview of T.A. while another detective observed the forensic interview of P.T. (Tr. at 66.)  The interviews were conducted approximately two weeks after the last reported incident of abuse. (Tr. at 124.)  Because of the time lapse between the last incident and the report, no physical evidence was collected from the children, but the interviews were videotaped. (Tr. at 66, 123.)  At the conclusion of the forensic interview, the detective decided to attempt a controlled telephone call by P.T. to S.A.A. in the hopes of coaxing some sort of admission from S.A.A. (Tr. at 67.)  However, that telephone call produced no admissions. (Tr. at 105-06.)  The detective then attempted to interview S.A.A. on two occasions. (Tr. at 70, 76-78.)  Though S.A.A. was intoxicated on both occasions, S.A.A. apparently made no admissions. (Tr. at 70-78.)  The detective testified that he was aware of three addresses where abuse was alleged to have occurred: 3399 Beechworth Drive, Apartment D; 877 Dublin-Granville Road, Apartment E; and 4519 Lakeside Drive South. (Tr. at 95, 101.)  The detective did not test any items for DNA because

---

[11] Filed in four consecutively paginated volumes on January 12, 2018 and cited herein solely by page number.

S.A.A. and the girls lived in the same place and finding DNA for all persons in residence on any particular article of clothing or furniture would not have been unusual or suggestive of any relevant fact. (Tr. at 95-96.)

{¶ 131} The social worker who interviewed the eldest of the alleged victims, P.T., testified next, but was first subject to voir dire outside the presence of the jury. In her voir dire, she testified that her job is "fact-finding" interviews of children in regard to sexual and physical abuse as part of a multi-disciplinary team that includes both medical providers and detectives. (Tr. at 131-32.) She admitted that she had not had medical training and was not qualified to give any medical opinion or diagnosis. (Tr. at 135-36.) She also admitted that her interviews are intended to assist both medical personnel and police. (Tr. at 137.) Despite a defense objection to her testimony and to the presentation of a video interview of P.T., the trial judge decided to permit her to testify. (Tr. at 140.) However, the trial court ruled that portions of the video in which P.T. made allegations concerning the youngest child (who was no longer part of the indicted offenses) should not be played. (Tr. at 152-56.)

{¶ 132} The video of P.T.'s forensic interview was then played for the jury. In her video interview, the jury was able to observe P.T. state that she was 12 and in 6th grade. (Tr. at 159.) She said that S.A.A. had sexual intercourse with her on a number of occasions ongoing until two weeks before the date of the interview, when her younger sister told her mother what was occurring. (Tr. at 164-65.) She said the molestation began when she was 10 and he started by blowing kisses at her. (Tr. at 167.) According to P.T., S.A.A.'s conduct progressed to digital penetration and finally to intercourse. *Id.* He would wake her up in the middle of the night by whispering in her ear. (Tr. at 168.) He would then force her to come downstairs where he would compel her to remove her clothes and have sex with her. (Tr. at 168-70.) This would last a couple of minutes. (Tr. at 175-76.) When he would finish, some liquid stuff would come out of his "middle part" or "pee-pee." (Tr. at 174-75, 203-04.) He would then clutch his penis to his stomach as he rushed to the bathroom, where she would hear him running water. (Tr. at 174-75, 203-04.) Sometimes he put oily stuff on his penis, which P.T. identified as "K-Y Jelly." (Tr. at 176.) Sometimes her sisters would be in the room when he had sex with her. (Tr. at 178-79.) He also forced her to permit him to touch her breasts, to manually stimulate his penis with her hand, and (on at least 5 occasions) to perform fellatio. (Tr. at 172-73, 182-85, 187, 190-91.) She related that stuff would come out of his penis while it was in her mouth; it would taste "nasty" and appeared

dirty and yellowish. (Tr. at 186-87.) He compelled her obedience and silence by threatening to kill her family if she disclosed the abuse. (Tr. at 164, 168-69.) He also shared stories with her about killing animals in Africa and fights he had been involved in. (Tr. at 192.) On one occasion she saw him doing something suspicious with her sister, T.A. (Tr. at 194-95.) No one else, she said, had ever done things like this to her. (Tr. at 198.) All of these statements appeared in the video of P.T.'s interview.

{¶ 133} The nurse who examined P.T. and T.A. testified next. She testified that the interview process is part of a multi-disciplinary assessment, one component of which is medical treatment. (Tr. at 236-37.) The interview can be helpful in deciding what tests (for example, for sexually transmitted diseases) to perform or what areas to examine. *Id.* A major part of the physical exam, she testified, is to reassure the parent and child that no lasting physical harm has been done. *Id.* She testified that the exams of both P.T. and T.A. were normal but that an exam conducted weeks after a rape, even of a prepubescent girl, often will reveal no physical sign of penetration trauma. (Tr. at 240-54.) She testified that she takes statements of potential victims at face value and that her role is not to find the truth. (Tr. at 255-56, 271-72.) Nonetheless, she was permitted to testify that she made a diagnosis in this case of sexual abuse because she believed abuse had occurred. (Tr. at 257.)

{¶ 134} The next witness was the girls' mother. She testified that she lived at 3399 Beechworth Drive with S.A.A. until July 2011, when she obtained a place of her own on Dublin-Granville Road. (Tr. at 290-92.) She stayed at the Dublin-Granville Road location until 2013, but S.A.A. would stay the night sometimes during that period. (Tr. at 291-92.) She moved in with S.A.A. again (this time to his place on Lakeside Drive) when she lost her job and could no longer afford her own place on Dublin-Granville Road. (Tr. at 304-05.) She testified that when she and S.A.A. lived together, she often worked overnight and that S.A.A. would be left with the children. (Tr. at 299-301.) In addition to S.A.A., she admitted that her brother (who had recently been released from prison) stayed with them for a period of some months and that a guy named Jim or Jimmy also stayed for several months with them at the Lakeside residence. (Tr. at 343-45, 349-50.)

{¶ 135} Next P.T.'s testimony was offered in person. In light of the fact that her interview video had already been played, the defense objected to her live testimony as cumulative. (Tr. at 406.) The defense's objection was overruled. *Id.*

{¶ 136} P.T.'s live testimony was that S.A.A. first had sex with her on the couch when she was nine. (Tr. at 415-16.) She testified that he had sex with her three times a

week on average and forced her to perform fellatio more than once per week. (Tr. at 420, 436-40.) According to P.T., S.A.A. compelled her compliance by threatening to hurt her family and to cause Children Services to take her away from her mother. (Tr. at 444-45.) In addition to the testimony above which diverged from her statements in the video interview in a number of ways, P.T. also related a number of specific incidents not mentioned at all in her video interview; these included one time when S.A.A. had sex with her while she was experiencing her period, a time when he forced her to bend over and submit to sexual intercourse in the basement, and another time when, as she bent over to remove a beverage from the refrigerator, he pulled down her pants, and began to have sex with her. (Tr. at 420-22, 429, 442-43.) She confirmed that her uncle and also someone named "Jimmy" lived with her family at times when the family was also living with S.A.A. (Tr. at 457-58, 465-66.) She agreed that there were people she could have talked to about the abuse when it was ongoing but that she did not do so until after T.A. told her mother what was happening. (Tr. at 467-70.) She also admitted that, even when her mother confronted her with T.A.'s statement, her initial reaction was to deny the abuse. (Tr. at 449.) She confessed that she was unable to give a specific date or time of any of the alleged rapes. (Tr. at 476.)

{¶ 137} Next, T.A. testified in person.[12] T.A. testified that S.A.A. would frequently touch her private areas while they were on the couch together. (Tr. at 520-24.) She said it hurt. (Tr. at 527-28.) Sometimes he would put his private part in her vagina. (Tr. at 531-32.) On some of these occasions, he would put "oil" on it first. (Tr. at 533-36.) On two occasions at the Lakeside address, he put his private part in her mouth. (Tr. at 536-39.) On another occasion, he tried to put his private part in her anus, but it hurt and he eventually desisted. (Tr. at 544-46.) She also testified that she witnessed some of the incidents with P.T. and could tell something was going on because P.T. would be making unusual sounds. (Tr. at 526.)

{¶ 138} The final witness to testify in the State's case-in-chief was the social worker who interviewed T.A. Like the prior social worker who testified, this social worker who conducted the interview agreed that the purpose of the forensic interview was to extract as much information from the child about the abuse allegations for a variety of purposes, including law enforcement and medical purposes. (Tr. at 635-37.) She agreed that she had

---

[12] Before her testimony began, the defense objected that the State was planning to play an interview video of her and that her live testimony would be cumulative. (Tr. at 406.)

no medical credentials and that her sole purpose was to gather information and accept what she was told at face value. (Tr. at 715, 718, 721.) She also agreed that the interview was conducted in a non-acute context in the sense that it had been more than 72 hours since the last alleged sexual abuse. (Tr. at 641-42.)

{¶ 139} Prior to this social worker's testimony, the defense renewed its objection to playing the interview videos and specifically objected to playing any parts of the video that would indicate that S.A.A. had abused the youngest sister (who was no longer part of the case). (Tr. at 582-630.) Consistent with its rulings concerning the previous video, the trial court ruled that the video could be played but that parts of it referring to allegations of abuse related to the youngest sister should be excised. (Tr. at 584-94.) The State agreed that every time the youngest sister's name was mentioned there would be a redaction. (Tr. at 594.) The parties then attempted to identify objectionable parts of the video but, due to issues with the video not having a time stamp, had difficulty doing so. *See, e.g.*, Tr. at 607; Joint Ex. 1. The video was then played before the jury and, despite the trial court's ruling, the agreement of the prosecution to redact, and the parties' attempt to identify parts of the video that were to be excluded, large portions of the video were played in which T.A. alleged that S.A.A. sexually abused the youngest sister. (Tr. at 653-70.) The trial court indicated that it had not reviewed the video, suggested the error was a result of defense counsel's failure to adequately identify offending portions of the video, and that any error in admitting unindicted allegations against the youngest sister would be harmless. (Tr. at 659-61.) It further expressed the view that all of the video could come in as a medical record but stated that it would provide an instruction to the jury to disregard references to the youngest sister. (Tr. at 667-69.)

{¶ 140} In the video that was ultimately played during trial, T.A. said she was eight years old when S.A.A. started blowing kisses and progressed to touching her chest. (Tr. at 678-81, 706-07.) During the interview, she wept as she explained how he had forced her to take his penis into her mouth. (Tr. at 689-90.) She also recounted that he put his "pee-pee" in her "pee-pee," that he held her down as he did it and told her to take a bath when he was done. (Tr. at 694-98.) She told the interviewer how he put his penis inside her butt multiple times and some "pee" or "white stuff" came out when he was putting it inside her butt. (Tr. at 702-04.)

{¶ 141} T.A.'s video statements also contained numerous allegations specifically as to P.T. and her younger sister. She alleged that S.A.A. had taken her and her younger sister

into a mall bathroom, duct-taped their mouths closed, and touched their privates. (Tr. at 653-59, 670-73.) T.A. related that S.A.A. would often touch her under the covers while they were on the couch and that he did this to the other two sisters as well. (Tr. at 676-77.) She claimed that S.A.A. kissed P.T. with his tongue out and frequently made P.T. fellate him with the result that stuff came out of his penis and went into P.T.'s mouth. (Tr. at 686-87, 691-93.) T.A. said P.T. told her S.A.A. made her watch porn and that he touched P.T. more than her because she was too fat. (Tr. at 683.) She also alleged that she saw S.A.A. "pee" on P.T. while raping her and that she saw "white stuff" come out of his penis and go into P.T.'s vagina. (Tr. at 698-99.) She claimed that he also put his penis in P.T.'s butt. (Tr. at 699-702.) Finally, she claimed that P.T. was also forced to touch S.A.A.'s penis with her hands. (Tr. at 707-09.) As a general matter, T.A. claimed that S.A.A. always touched each of the sisters in front of the others. (Tr. at 653, 673-74, 681.)

{¶ 142}  T.A.'s video statements also contained other prejudicial allegations having little or nothing to do with the allegations in the case. T.A. related that S.A.A. behaved threateningly and erratically, saying he would kill the three girls and their mother, whom he claimed was a prostitute who frequented strip clubs. (Tr. at 674-75.) T.A. also alleged that S.A.A. was a practitioner of voodoo, who had a voodoo doll of her mother, and would use it to kill her if she ever tried to hurt him. (Tr. at 674.) According to T.A.'s video statements, S.A.A. once demonstrated his threat to T.A.'s mother by waving knives over her head as she slept. *Id.* S.A.A. was also prone, according to T.A., to accusing the girls and their mother of godlessness. (Tr. at 672.)

{¶ 143}  After deliberating, the jury found S.A.A. guilty of all 15 counts submitted to it. (July 24, 2017 Verdict Forms; Tr. at 859-66.) In a sentencing hearing held on August 23, 2017, the defense argued that because the children were vague as to how many assaultive events occurred and when they occurred, the counts should merge. (Tr. at 880-81.) The trial court declined to merge the counts, finding each to be separate and distinct offenses. (Tr. at 886.) Ultimately, the trial court imposed life without parole plus 25 years to life. (Tr. at 887; Aug. 28, 2017 Jgmt. Entry at 2.) Specifically, the trial court imposed 5 years to be served concurrently on each of the 4 gross sexual imposition counts, 25 years to life on each of the 6 rape counts related to P.T., and life without parole for each of the 5 rape counts related to T.A., with one of the rape counts for P.T., to be served consecutively to one of the rape counts for T.A. (Tr. at 887; Aug. 28, 2017 Jgmt. Entry at 2.)

{¶ 144}   As the majority notes, S.A.A. presents seven assignments of error for our review in his appeal from this latest trial and conviction.  However, the one that is the focus of this dissent, is his fourth:

> MR. [S.A.A.'S] RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW WERE VIOLATED WHEN THE TRIAL COURT ALLOWED THE STATE TO PRESENT IRRELEVANT, CUMULATIVE, OVERLY PREJUDICIAL EVIDENCE ABOUT ALLEGATIONS OF A SEXUAL ASSAULT FOR WHICH THE ACCUSED WAS NOT ON TRIAL.

## III.  DISCUSSION

### A. Fourth Assignment of Error – Whether the Trial Court Erred in Admitting the Interview Videos of P.T. and T.A.

#### 1.  Standard of Review

{¶ 145}   "Generally, '[t]he admission of evidence is within the discretion of the trial court.' "  *Shaw v. Underwood*, 10th Dist. No. 16AP-605, 2017-Ohio-845, ¶ 25, quoting *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 36, citing *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38.  The decision to admit or exclude evidence is reviewed for abuse of discretion.  *Underwood* at ¶ 25.  Yet, "[a]lthough an abuse of discretion is typically defined as an unreasonable, arbitrary, or unconscionable decision, we note that no court has the authority, within its discretion, to commit an error of law."  (Citations omitted.)  *State v. Chandler*, 10th Dist. No. 13AP-452, 2013-Ohio-4671, ¶ 8; *see also JPMorgan Chase Bank, N.A. v. Liggins*, 10th Dist. No. 15AP-242, 2016-Ohio-3528, ¶ 18.  "We therefore review the decision of the trial court for abuse of discretion with the understanding that if the trial court erred on a question of law, even with respect to an evidentiary issue, that such is an abuse of discretion."  *Pontius v. Riverside Radiology & Interventional Assocs.*, 10th Dist. No. 15AP-906, 2016-Ohio-1515, ¶ 15.

#### 2.  Hearsay Analysis

{¶ 146}   It is undisputed that the interview videos of P.T. and T.A. are hearsay.  They were statements made out of court and offered in court as factual proof that S.A.A. committed the sexual crimes alleged.  *See* Evid.R. 801(C).

{¶ 147}   Thus, I examine exceptions to hearsay.   There is a specific exception for "Child Statements in Abuse Cases" to the general prohibition on hearsay:

> (A) An out-of-court statement made by a child who is *under twelve years of age at the time of trial* or hearing describing any sexual activity performed, or attempted to be performed,

by, with, or on the child or describing any act or attempted act of physical harm directed against the child's person is not excluded as hearsay under Evid.R. 802 if *all* of the following apply:

(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual activity or attempted sexual activity, or of the act or attempted act of physical harm directed against the child's person;

(2) The child's testimony is not reasonably obtainable[13] by the proponent of the statement;

---

[13] This term is defined in the rule:

(B) The child's testimony is "not reasonably obtainable by the proponent of the statement" under division (A)(2) of this rule only if one or more of the following apply:

(1) The child refuses to testify concerning the subject matter of the statement or claims a lack of memory of the subject matter of the statement after a person trusted by the child, in the presence of the court, urges the child to both describe the acts described by the statement and to testify.

(2) The court finds all of the following:

(a) the child is absent from the trial or hearing;

(b) the proponent of the statement has been unable to procure the child's attendance or testimony by process or other reasonable means despite a good faith effort to do so;

(c) it is probable that the proponent would be unable to procure the child's testimony or attendance if the trial or hearing were delayed for a reasonable time.

(3) There is independent proof of the sexual activity or attempted sexual activity, or of the act or attempted act of physical harm directed against the child's person;

(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.

(Emphasis added.) Evid.R. 807(A). No effort was made to introduce the video interviews under this exception and the State does not argue that either video could have met the strict requirements of this section. Evid.R. 807(A) requires, for instance, the child must be under the age of 12 at the time of the trial for the exception to operate, and I note that in S.A.A.'s second trial both children were over 12 years old.

{¶ 148} The record shows that the State instead argued that the videos were medical records and that the trial court permitted the State to successfully introduce the videos as medical records without ever reviewing the videos before their admission and airing before the jury. The Ohio Rules of Evidence permit hearsay testimony to be admitted if the hearsay consists of:

(4) **Statements for purposes of medical diagnosis or treatment.** Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

---

(3) The court finds both of the following:

(a) the child is unable to testify at the trial or hearing because of death or then existing physical or mental illness or infirmity;

(b) the illness or infirmity would not improve sufficiently to permit the child to testify if the trial or hearing were delayed for a reasonable time.

The proponent of the statement has not established that the child's testimony or attendance is not reasonably obtainable if the child's refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the statement for the purpose of preventing the child from attending or testifying.

Evid.R. 807(B).

(Emphasis sic.) Evid.R. 803(4). When the Supreme Court of Ohio first squarely confronted the application of this exception in cases such as this, in *State v. Boston*, it observed that the traditional rationale of the exception is that persons seeking aid from a doctor will not generally lie to the doctor because that might interfere with appropriate aid being rendered. *See State v. Boston*, 46 Ohio St.3d 108, 120-21 (1989). Based on that rationale, *Boston* concluded that unless the child's motivation in making the hearsay statement was to obtain medical aid, the hearsay statement's reliability would not be enhanced, and it would thus not properly be admitted under Evid.R. 803(4). *State v. Dever*, 64 Ohio St.3d 401, 407 (1992) (summarizing *Boston* at 120-24); *see also* Evid.R. 102.

{¶ 149} However, the state's high court in *Dever* modified *Boston* so that proof was no longer required of the subjective motive on the part of the child to obtain medical aid. *Dever* at 407-14. Instead, *Dever* now only requires asking whether, when viewed objectively, the statements made by the child were made for the purpose of diagnosis and treatment. *Dever* at paragraph two of the syllabus.

{¶ 150} *Dever* has continued to be the law in Ohio since 1992, and it is through this lens we must determine a hearsay exception in cases such as this. Thus, under *Dever*, even though the child's *subjective motivation* is not the key, the *objective purpose* for which each statement was made continues to be the determinative inquiry. The Supreme Court has, as late as 2010 in the context of the Confrontation Clause, recognized that interviews of children given to social workers in sexual abuse cases serve dual purposes: evidence collection for use by the police, and patient history for use in medical diagnosis and treatment. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 2, 33. When considering whether to admit each statement uttered during an interview, the primary purpose of the particular statement must be considered: if it is made for medical diagnosis and treatment, it is nontestimonial and within the exception; if it serves primarily a forensic or investigative purpose, it is testimonial, potentially offensive to the Confrontation Clause, and not within the hearsay exception. *Id.* at paragraphs one and two of the syllabus.

{¶ 151} In *Arnold*, the Supreme Court recognized that statements about the environment in which a crime occurred (such as a locked bathroom), discussion about whether there were witnesses to the crime (location of a mother and brother), and descriptions related to articles of clothing and body parts were "related primarily" to the forensic investigation, not medical diagnosis or treatment. *Id.* at ¶ 34. Conversely, statements "that Arnold touched her 'pee-pee,' that Arnold's 'pee-pee' went inside her 'pee-

pee,' that Arnold's 'pee-pee' touched her 'butt,' that Arnold's hand touched her 'pee-pee,' and that Arnold's mouth touched her 'pee-pee,' were * * * necessary for the proper medical diagnosis and treatment." *Id.* at ¶ 38. In short, statements as to the identity of the perpetrator and the acts committed are appropriately considered medical history and are deemed nontestimonial and "reasonably pertinent to diagnosis or treatment" to fall within the medical records exception to the hearsay rule. Evid.R. 803(4).

{¶ 152} Other information, however, is not, and this is why it was incumbent on the trial court to review the videos before admitting them and airing them before the jury. In this case, despite repeated defense objections, the video interviews of both P.T. and T.A. were presented in their essential totality.[14] (Feb. 4, 2017 Mot. to Exclude Forensic Interviews; Tr. at 140, 152-201, 406, 580-630.) The trial court, despite not having seen the videos, ruled that they would be admitted. (June 29, 2017 Hearing Tr. at 23, 30;Tr. at 659.)

{¶ 153} Even after viewing the videos during the trial and addressing them in mid-trial and pre-trial motions, the trial court apparently conducted no analysis required by *Arnold.* Rather, the trial court broadly characterized the videos as "medical records" and concluded that they were entirely admissible. (Tr. at 667 (The trial court stating that the videos "come in under medical records. These are medical records."); Tr. at 669 ("It is a medical record. The whole thing could come in.").) *Arnold* and Evid.R. 803(4) require analysis of the actual content of the statements. The utter failure to review and perform some analysis of the character of such evidence before admitting it thus constitutes an error of law. The critical issue under Evid.R. 803(4) is not whether a thing is denominated a medical record, or whether it came from a hospital, or whether the interview happened at a hospital. The issue is whether the *content* of each of the statements given by an interviewee was objectively "reasonably pertinent to diagnosis or treatment" or whether its primary purpose was to further forensic investigative ends. Evid.R. 803(4); *Arnold* at ¶ 2, 33-34, 38; *Dever* at paragraph two of the syllabus.

{¶ 154} The videotaped interviews in this case contained numerous prejudicial allegations and statements that went beyond the medically relevant identity of the alleged perpetrator or the sexual acts committed against the declarant, as contemplated by *Arnold*

---

[14] Although the prosecution had agreed to redact and the Court had decided to exclude statements about acts alleged to have been committed by S.A.A. against the youngest sister, these statements were admitted and aired before the jury, with the trial court blaming the defense for not having adequately identified the portions that should not have been shown and finding that a curative instruction was sufficient to overcome any influence they may have had on the jury. (Tr. at 584-94, 659-61, 667-69.)

at ¶ 34, 38.  For example, P.T.'s video contained statements about how the allegations came to light, the identities of witnesses to the events, threats S.A.A. had made against her mother and family, and allegations about him sharing stories about killing animals in Africa and fights he had been in. (Tr. at 164-69, 192.)  T.A.'s video contained allegations regarding uncharged conduct, identified witnesses to the alleged acts, alleged that S.A.A. was a practitioner of voodoo, stated that S.A.A. regarded T.A.'s mother as a godless prostitute, and alleged that he threatened her family. (Tr. at 653, 673-75.)  T.A.'s video also contained numerous allegations of abuse against the youngest sister who was the subject of counts of the indictment that were dismissed before trial, who did not testify, and who was not subject to cross examination. (Tr. at 653-59, 670-77, 681.)  These were not medically significant statements, were unfairly prejudicial, and also constituted improper evidence of "other crimes, wrongs or acts." Evid.R. 401; Evid.R. 402; Evid.R. 403(A); Evid.R. 404(B).

{¶ 155}  Moreover, the interviews occurred two weeks after the last incident of abuse, after both children had already been seen in an emergency room setting. (Tr. at 124, 164-65, 454, 508.)  They were conducted by social workers with police present. (Tr. at 66, 131-32, 135-37, 635-37, 715, 718, 721.)  No testimony suggested that any medical treatment was provided to either P.T. or T.A. as an immediate consequence of the interviews (though there was some indication in the record that the girls sought counseling after relocating to New York years after the abuse). (Tr. at 430-31, 635.)  No further interviews of P.T. or T.A. were sought by the police, justifying the inference that the interviews were sufficient for their investigative purposes.  Following P.T.'s video interview, the investigation continued with a controlled telephone call by P.T. to S.A.A. in the hopes of coaxing some sort of admission from S.A.A. (Tr. at 67.)  All these factors bespeak at least a partial purpose of the interviews to provide investigative information, not solely a purpose to obtain information "reasonably pertinent to diagnosis or treatment." Evid.R. 803(4); *Arnold* at ¶ 2, 33, syllabus; *Dever* at paragraph two of the syllabus.

{¶ 156}  Both social workers and the nurse examiner testified at trial that their role is not to question the child in any way, but to simply take all statements at face value.  (Tr. at 214-15, 271-72, 721.)  These professionals were not required to limit questioning to what is needed for a medical diagnosis.  However, the trial court *was* required to analyze the statements made in the video and determine whether they were medical or investigative and require that some portions of the video not be admitted or shown to the jury in order to abide by the Ohio Rules of Evidence. *See* Evid.R. 803(4); *Arnold* at ¶ 2, 33-34, 38,

syllabus; *Dever* at paragraph two of the syllabus. When the trial court failed to do so it committed a legal error.

{¶ 157} The majority devotes considerable analysis to the fact that T.A. and P.T. testified. *See majority supra* at ¶ 14-18. While this is a correct and pertinent observation for Confrontation Clause analysis, it has no relevance to my conclusion that these videos contained considerable amounts of inadmissible hearsay. It is not an exception to the rule excluding hearsay that the declarant was present to testify. *See* Evid.R. 801 et seq. In fact, loosening of the exclusionary rule (in the form of further exceptions) occurs only when the declarant is NOT available to testify. Evid.R. 804. When the declarant is present to testify, a hearsay statement by that same declarant is not only hearsay, it is potentially repetitive and cumulative. *See* Evid.R. 403(B).

{¶ 158} The majority also concludes that any error in admitting these videos was harmless. *See majority supra* at ¶ 22-23. I initially note that the State did not even argue in its appellate brief that the introduction, if erroneous, was harmless. (State's Brief at 31-37.) Thus, the majority's conclusion in this regard seems akin to a sua sponte plain-error analysis in a case where the issue examined according to this analysis was repeatedly raised and preserved at every stage of the trial proceedings.

{¶ 159} Even ignoring the fact that the State did not argue that these errors were harmless, the circumstances of this case do not justify the conclusion that wholesale admission of the video statements was "harmless beyond a reasonable doubt." *See State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 27-29, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, fn. 5 (1983) (noting that " ' "the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction" ' "). There was no physical evidence in this case and no testifying witnesses with personal knowledge other than P.T. and T.A. Thus, this case, hinged entirely on their credibility. In that circumstance, it was harmful to S.A.A.'s defense to permit them to essentially confirm the video or their testimony by permitting the same testimony by the same witnesses once live and once by video, and from thereby to permit the drawing of inferences that were argued from such cumulative and often irrelevant testimony. P.T.'s video, for example, contained statements about threats S.A.A. had made against her mother and family, discussion of killing animals in Africa, and assertions about fights he had been in. (Tr. at 164-65, 168-69, 192.) T.A.'s video contained allegations regarding uncharged

conduct, including what amounted to kidnapping and forcible sexual abuse of a small child, alleged that S.A.A. was a practitioner of voodoo, stated that S.A.A. regarded T.A.'s mother as a godless prostitute, and alleged that he threatened her family. (Tr. at 653-59, 670-75.) These assertions have nothing to do with medical diagnosis or treatment as contemplated by *Dever* and *Arnold*.

{¶ 160}   The simple fact is we do not know what was in the minds of the jury. It thus cannot be said, beyond a reasonable doubt, that the jury was not affected by the fact that the victims were allowed to effectively testify more than once and introduce considerable irrelevant but inflammatory accusations in a case where proof relied entirely on the testimony of the two victims. In finding otherwise, the majority appears to have let its understandable revulsion over the facts of this case cloud its duty to insist that all defendants, even ones accused of horrible and disgusting crimes, be given a fair trial. I therefore respectfully dissent from the majority's resolution of this assignment of error.

## B.  First, Second, Third, Sixth, and Seventh Assignments of Error – Unripe

{¶ 161}   Because I would sustain S.A.A.'s fourth assignment of error, which would require reversal and remand for a new trial, I would find the assignments of error related to other issues that arose in the trial and sentencing to be rendered moot or unripe.

## C.  Fifth Assignment of Error – Whether S.A.A.'s Conviction was Not Supported by Sufficient Evidence and Mootness with Respect to Whether S.A.A.'s Conviction was Against the Manifest Weight of the Evidence

{¶ 162}   Because my resolution of the fourth assignment of error would require reversal and remand, to the extent the fifth assignment of error seeks that we find that S.A.A.'s convictions were against the manifest weight of the evidence, I would find that portion of the assignment of error to be moot. However, as to sufficiency of the evidence that was adduced and admitted at trial and despite my views on the evidentiary problems with it, given what was heard by the jury, I agree with the majority.[15] Thus, examining the sufficiency of the evidence at trial and relying solely on the live testimony of P.T. and T.A., S.A.A.'s conviction was sufficiently supported by the evidence placed before the jury.

---

[15] If this Court agreed with S.A.A. that the evidence was insufficient, S.A.A. could not be retried. "[T]he Double Jeopardy Clause does not preclude retrial of a defendant if the reversal was grounded upon a finding that the conviction was against the weight of the evidence. However, retrial is barred if the reversal was based upon a finding that the evidence was legally insufficient to support the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *Tibbs v. Florida*, 457 U.S. 31, 47 (1982).

## IV. CONCLUSION

{¶ 163}   I would find that the trial court committed an error of law when it permitted forensic interviews of P.T. and T.A. to be played for the jury substantially in their entirety without first reviewing and analyzing the videos to determine if the objective purpose of each of the objected-to statements the videos contained was either investigative or medical. The trial court should have limited the airing of the videos before the jury to only those statements made for the objective purpose of providing medical information.  Sustaining S.A.A.'s fourth assignment of error according to this view of the evidence would render S.A.A.'s remaining assignments of error either unripe or moot, except insofar as S.A.A. argues (in his fifth assignment of error) that his convictions were insufficiently supported by the evidence at trial.  As to that portion of the fifth assignment of error,  I would conclude that the live testimony of P.T. and T.A. as presented, was sufficient to establish S.A.A.'s guilt.  Thus, as to the portion of S.A.A.'s fifth assignment of error regarding sufficiency of the evidence, I concur with the majority's judgment as to that assignment of error.

{¶ 164}   I otherwise respectfully dissent.

————————————